Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Caitlin Baunsgard
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 19 2023

SEAN F. MCAVOY, CLERK
_____, DEPUTY
YAKIMA, WASHINGTON

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) 2:23-CR-0046-MKD |
| | ) |
| v. | ) |
| | ) PLEA AGREEMENT |
| EDWARD JAMES SALVADOR (aka "Droopy"), | ) |
| | ) |
| Defendant. | ) |

Plaintiff United States of America, by and through Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, and Caitlin Baunsgard, Assistant United States Attorney for the Eastern District of Washington, and Defendant, EDWARD JAMES SALVADOR (aka "Droopy") ("Defendant"), both individually and by and through Defendant's counsel, Dave Partovi, agree to the following Plea Agreement:

1.  **Guilty Plea and Maximum Statutory Penalties**:

Defendant agrees to enter a plea of guilty to Count 1 of the Indictment filed on April 18, 2023, charging Defendant with Conspiracy to Distribute 500 Grams or More of Methamphetamine and 400 Grams or More of Fentanyl, in violation of 21 U.S.C. § 846, a Class A felony.

Defendant understands the following potential penalties apply:

PLEA AGREEMENT - 1

    a.    a term of imprisonment of not less than 10 years up to a life term;

    b.    a term of supervised release of not less than 5 years and up to a lifetime;

    c.    a fine of up to $5,000,000; [handwritten: $10,000,000 CSB] [initials]

    d.    denial of federal benefits; and

    e.    a $100 special penalty assessment.

2. <u>Supervised Release</u>:

Defendant understands that if Defendant violates any condition of Defendant's supervised release, the Court may revoke Defendant's term of supervised release, and require Defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision, up to the following terms:

    a.    5 years in prison if the offense that resulted in the term of Supervised Release is a class A felony,

    b.    3 years in prison if the offense that resulted in the term of Supervised Release is a class B felony, and/or

    c.    2 years in prison if the offense that resulted in the term of Supervised Release is a class C felony.

Accordingly, Defendant understands that if Defendant commits one or more violations of supervised release, Defendant could serve a total term of incarceration greater than the maximum sentence authorized by statute for Defendant's offense or offenses of conviction.

3. <u>Denial of Federal Benefits</u>:

Defendant understands that by entering this plea of guilty to Count 1, Defendant is no longer eligible for assistance under any state program funded under part A of Title IV of the Social Security Act (concerning Temporary Assistance for Needy Families) or benefits under the food stamp program or any state program carried out

PLEA AGREEMENT - 2

under the Food Stamp Act. 21 U.S.C. § 862a. Defendant also understands that the Court may deny Defendant's eligibility for any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States. 21 U.S.C. § 862.

4. <u>Potential Immigration Consequences of Guilty Plea</u>:

If Defendant is not a citizen of the United States, Defendant understands the following:

  a. pleading guilty in this case may have immigration consequences;

  b. a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty;

  c. removal from the United States and other immigration consequences are the subject of separate proceedings; and

  d. no one, including Defendant's attorney or the Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status.

Defendant affirms that Defendant is knowingly, intelligently, and voluntarily pleading guilty as set forth in this Plea Agreement, regardless of any immigration consequences that Defendant's guilty plea may entail.

5. <u>The Court is Not a Party to the Plea Agreement</u>:

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands the following:

  a. sentencing is a matter solely within the discretion of the Court;

  b. the Court is under no obligation to accept any recommendations made by the United States or Defendant;

PLEA AGREEMENT - 3

  c. the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

  d. the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

  e. the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

  f. the Court may reject recommendations made by the United States or Defendant, and that will not be a basis for Defendant to withdraw from this Plea Agreement or Defendant's guilty plea.

6. <u>Waiver of Constitutional Rights</u>:

Defendant understands that by entering this plea of guilty Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

  a. The right to a jury trial;

  b. The right to see, hear and question the witnesses;

  c. The right to remain silent at trial;

  d. The right to testify at trial; and

  e. The right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands Defendant retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if Defendant cannot afford to hire an attorney.

Defendant understands and agrees that any defense motions currently pending before the Court are mooted by this Plea Agreement, and Defendant expressly waives Defendant's right to bring any additional pretrial motions.

7. <u>Elements of the Offense</u>:

The United States and Defendant agree that in order to convict the Defendant of Conspiracy to Distribute 500 Grams or More of Methamphetamine and 400 Grams or

PLEA AGREEMENT - 4

More of Fentanyl, in violation of 21 U.S.C. § 846, the United States would have to prove beyond a reasonable doubt the following elements:

> *First*, beginning on a date unknown, but by January 2022 and continuing on to April 18, 2023, in the Eastern District of Washington and elsewhere, entered into an agreement with one or more persons to commit the crime of distribution of 500 grams or more of methamphetamine or 400 grams or more of fentanyl, as charged in the Indictment;
>
> *Second*, Defendant became a member of the conspiracy knowing of at least one if its objects and intending to help accomplish it; and
>
> *Third*, the agreement was to distribute 500 grams or more of a methamphetamine or 400 grams or more of fentanyl, which would be reasonably foreseeable to him as a member of the conspiracy.

8.  <u>Statement of Facts and Stipulation</u>:

The United States and Defendant stipulate and agree to the following: the facts set forth below are accurate; the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for Defendant's guilty plea.

The United States and Defendant agree that this statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts that are relevant to the Sentencing Guidelines computation or sentencing, unless otherwise prohibited in this Plea Agreement. The parties further agree and stipulate that this factual basis is simply a summary to support the plea, it does not contain all facts which could be proven by the United States.

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), Moses Lake Police Department ("MLPD"), Department of Homeland Security Investigations ("HSI"), and the Columbia River Drug Task Force ("CRDTF") were investigating a drug trafficking organization operating between the Wenatchee and Moses Lake,

PLEA AGREEMENT - 5

Washington areas. Through this long-term investigation, multiple investigative techniques were used, to include tracking warrants, confidential informants, controlled buys, and cooperating defendant interviews. Through the investigation, Defendant was identified as a main participant, and a leader of the organization in the Wenatchee area.

In early 2022, several confidential informants advised the CRDTF Defendant was involved in the trafficking of a large quantities of fentanyl-laced pills, had a source of supply of methamphetamine and fentanyl pills in the Bakersfield, California area, and was attempting to set up operations for his California source of supply to "cook" methamphetamine at a compound in the Moses Lake area, run by co-defendant Even BARAJAS-MARTINEZ. The confidential informants advised Defendant was working with other high-level drug traffickers in the area to establish this "cook" site, to include Alejandro TORRES (aka "Pisa Alex") and Victor ROJAS-RIVERA.

The confidential informants also advised Defendant was supplying multiple Sureno gang members in the Wenatchee area, and they were all working together distribute pills. These individuals included co-defendants Edward VELA-HERNANDEZ (aka "Dome"), Diego CANO (aka "Sisqo"), Nicholas FULCHER, Jorge VERDUZCO-MENDOZA, and Ricardo CASTRO-VASQUEZ. Additionally, co-defendant Jennifer FIGUEROA was identified as a main distributor for the group.

*Traffic Stops in California*

One of the confidential informants ("CI") advised Defendant was operating in concert with co-defendant Samuel BLANCHFIELD in trafficking methamphetamine and fentanyl from the California source of supply to the Wenatchee area for distribution. CRDTF learned BLANCHFIELD had been stopped by law enforcement twice in California while on trips back from California to Wenatchee wherein he had obtained methamphetamine and fentanyl from the source of supply to bring back to Wenatchee. BLANCHFIELD was engaged in this activity in concert with Defendant. Specifically, on January 18, 2022, BLANCHFIELD was located by law enforcement

PLEA AGREEMENT - 6

in the Stockton, California area, and he was ultimately found to be in possession of over 4 pounds of methamphetamine and approximately 2,000 fentanyl-laced pills, and a money counter. In March 2022, BLANCHFIELD was located in Siskiyou County, California, and he was found in possession of just over 1 pound of methamphetamine as well as a small amount of heroin.

*Controlled Buy of Fentanyl from Defendant*

On March 3, 2022, the CI and Defendant engaged in a lengthy recorded call wherein Defendant advised he was in California with CANO and was ensuring they were picking up enough controlled substances for his "homies". The CI and Defendant engaged in explicit drug-related conversations about prices and quantities, as well as frequency of future trips to California. After the conversation with Defendant, the CI engaged in conversations with CANO about additional specifics on pricing for the future delivery of controlled substances.

On March 11, 2022, the CI received a message from CANO that he and Defendant were back in the area and likely would have better prices for the controlled substances than previously discussed. At the direction of CRDTF, the CI ordered 1 pound of methamphetamine and 1,000 of fentanyl pills from Defendant. The CI agreed to pay $2,000 at the time of the purchase and owe Defendant the remaining amount on a "front" (*i.e.* consignment). Defendant told the CI to come to the motel he was staying at. The CI and CI's vehicle were searched before and after the controlled buy with no contraband located. Under surveillance of law enforcement, the CI traveled to Defendant's motel and went into his motel room. The CI and Defendant discussed the fact this was an "audition" for the CI and the CI needed to produce results to continue working with the group. Defendant noted he was disappointed with some members of the group as they were not making money. The CI and Defendant discussed prices, and quantities of future amounts of controlled substances as well as discussed how easy it would be to make money at the prices Defendant was able to offer his people, like CANO. Defendant also advised his source of supply in

PLEA AGREEMENT - 7

California cooks his own methamphetamine and it was not ready yet, so he (Defendant) could only give the CI the 1,000 pills. Defendant provided the CI with approximately 1,000 pills in exchange for the pre-recorded U.S. Currency. The CI left the location, met with CRDTF, and provided the purchased pills. The pills were sent to the Drug Enforcement Administration ("DEA") for testing, and those results are pending.

*Meetings at BARAJAS' Compound*

On March 30, 2022, the CI, Defendant, and VELA-HERNANDEZ went to a meeting at BARAJAS' Moses Lake compound. Also in attendance at the meeting were BARAJAS, TORRES, ROJAS, and the California source of supply. During the meeting, the group discussed the fact they were losing money because they were not moving enough product. The source of supply committed to ramping up the "cook" (*i.e.* production of methamphetamine) at the compound. Also during the meeting, TORRES advised he was going to be taking some drugs from ROJAS to VERDUZO-MENDOZA later that evening. While at the compound, Defendant and VELA-HERNANDEZ introduced the CI to BARAJAS so the CI could obtain drugs directly from BARAJAS in the future if the need arose. Defendant and BARAJAS also discussed a disagreement over a drug debt, and it was decided that BARAJAS would pay Defendant 15,000 fentanyl pills to clear the debt.

Shortly after the meeting, the GPS tracker on ROJAS' vehicle showed the vehicle left BARAJAS' compound, traveled into Oregon, and then returned to BARAJAS' compound, where surveillance observed several individuals unloading packages from the vehicle.

On March 31, 2022, Defendant and the CI traveled back to BARAJAS' compound to collect the pills discussed the previous day. During the drive from Wenatchee to BARAJAS' compound, Defendant advised he procured 15 pounds of ephedrine (a precursor chemical) for the "cook" and it was ready to go at BARAJAS' compound. Defendant stated that BARAJAS was going to be getting about half the

PLEA AGREEMENT - 8

methamphetamine from the cook as payment for letting them cook the methamphetamine at his property as well as getting most of the other materials for the "cook". At the compound, the CI, Defendant, and BARAJAS engaged in conversation about cooking and selling methamphetamine and BARAJAS asked the CI and Defendant to sell methamphetamine for him, stating that he (BARAJAS) could get them at a better price. The meeting ended with BARAJAS giving Defendant approximately 20,000 fentanyl pills, stating they were from ROJAS.

*Attempted Controlled Buy from VELA-HERNANDEZ*

On April 14, 2022, the CI arranged to purchase 100 fentanyl pills from VELA-HERNANDEZ in Wenatchee. During the recorded conversation to arrange the purchase, VELA-HERNANDEZ advised Defendant was in Moses Lake to get a "boat" of fentanyl pills (*i.e.* 1,000 pills). The CI and VELA-HERNANDEZ met in the CI's vehicle at VELA-HERNANDEZ's residence. The CI affirmed he/she would like 100 pills and also asked for 1 ounce of methamphetamine. VELA-HERNANDEZ said he had a whole bunch of the "clear" (*i.e.* methamphetamine), but he had already fronted most of it, and showed the CI what he had left, a "big ass rock", which VELA-HERNANDEZ guessed would be approximately 14 grams. The CI showed VELA-HERNANDEZ the pre-recorded currency ($700) and affirmed he/she wanted a roll and a full ounce at least. VELA- HERNANDEZ asked to see the money again. After some small talk, and calling others, VELA-HERNANDEZ advised that Defendant took all of VELA-HERNANDEZ's money for drugs with him to Moses Lake. The CI asked VELA-HERNANDEZ if he would take $120 or $125 for rock and VELA-HERENADEZ affirmed but needed to get a scale. VELA-HERNANDEZ exited the vehicle and entered a nearby apartment. After a few minutes, VELA-HERNANDEZ came back, entered the vehicle, and advised he just sold the rock to the lady in the apartment.

PLEA AGREEMENT - 9

*Continued Communications with Defendant*

Through April 2022, Defendant and the CI engaged in communications reference future supplies for the CI. For example, on April 16, 2022, the CI did not answer several calls from Defendant, and Defendant sent a message indicating the CI missed out on a shipment of 3,000 fentanyl pills. The next day, Defendant and the CI communicated about the CI obtaining 2,000 fentanyl pills from Defendant.

*Defendant's Post-Miranda Statement*

Defendant was arrested in September 2022, and provided a recorded post-*Miranda* statement. In summary, Defendant advised that he was sourced by an individual in California with both methamphetamine and fentanyl pills. He estimated he would make the trips to California about every 2 weeks. He stated that he started by bringing 1 "boat" of pills, and then it escalated steadily to 20,000 pills at a time. His supplier wanted to cook methamphetamine and was looking for a place to accomplish that, so Defendant contacted BARAJAS through CANO and BARAJAS agreed to let them use his property to cook methamphetamine; however, they were never able to do a cook there, as BARAJAS was not able to produce the anhydrous ammonia needed for the cook, so the supplier was cooking off ephedrine in an attempt to make the anhydrous ammonia.

Defendant recounted a meeting at BARAJAS' compound with BARAJAS, VELA-HERNANDEZ, ROJAS, TORRES, his source of supply, and several other individuals wherein they discussed a "peace treaty", and Defendant agreed to accept 22,000 fentanyl pills from ROJAS and 100,000 fentanyl pills from his supplier to affirm this treaty. Defendant stated he only received 5,000 pills from this agreement.

Defendant stated that CANO, VELA-HERNANDEZ, FULCHER, CASTRO-VASQUEZ, FIGUEROA, and MACHEN were all selling drugs for

PLEA AGREEMENT - 10

him. Defendant further stated usually when he would return with a new supply, he would give CANO and VELA-HERNANDEZ 5,000 pills each, and FULCHER 500 pills.

Defendant also stated that BLANCHFIELD was his partner on several trips to California to obtain drugs from his supplier. BLANCHFIELD also made the trip down to California to meet the supplier to obtain drugs twice, and was arrested both times, so their partnership ended after that.

*Cooperating Defendants*

Multiple cooperating defendants provided information about this organization. CD1 advised Defendant was trafficking drugs and utilized VERDUZO-MENDOZA's residence as a stash location, as well as FIGUEROA's residence. CD1 advised that CANO was assisting Defendant in his drug dealing activities as Defendant's second in command. CD1 stated Defendant would make a trip to his source in California approximately once per week to a week and a half, and estimated Defendant would pick up around 10,000 – 15,000 fentanyl pills and 15-20 pounds of methamphetamine to bring back to Wenatchee, and he would usually have CANO travel with him. CD1 stated he/she would receive some of those drugs to sell, and the rest went to other members of the group. When Defendant brought the load to Wenatchee, Defendant and whoever was helping on in the trip would take a portion of drugs to FIGUEROA's residence and the rest to VERDUZO-MENDOZA's residence. CD1 was originally going to take trips to California to pick up drugs for Defendant but was instead tasked with helping Defendant manufacture 3-D "ghost guns". CD1 stated that VELA-HERNANDEZ sold about 1 pound of methamphetamine a week for Defendant. CD1 said CANO sells about 1 pound of methamphetamine and 1,000 fentanyl pills every 2-3 weeks, holds most of the guns for the group, and acts as an enforcer. CD1 said Defendant and ROJAS each run their own organization; however, also worked together in drug trafficking. CD1 also advised they had

PLEA AGREEMENT - 11

carjacked TORRES at CASTRO-VASQUEZ's residence over a debt ROJAS owed to Defendant for 15,000 fentanyl pills. CD1 advised that in retaliation, TORRES and VERDUZO-MENDOZA kidnapped Jon MACHEN.

CD2 advised he obtained fentanyl pills from Defendant and estimated that Defendant was obtaining 10,000 pills from his source every week or two. CD2 recounted an incident where Defendant accused CD2 of attempting to rob him based on information provided by FIGUEROA and pulled a firearm on him/her and threatened him. CD2 advised that CANO was Defendant's right-hand man. CD2 also advised Defendant also worked with ROJAS. CD2 also detailed that Defendant was involved in printing 3D guns.

CD3 advised that he/she obtained methamphetamine from Defendant and assisted Defendant in finding customers. CD3 advised ROJAS owed Defendant a drug debt, so Defendant, CANO, and FULCHER took TORRES' vehicle. After that, Defendant started working with ROJAS. CD3 advised that VERDUZCO-MENDOZA and VELA-HERNANDEZ were selling pills for Defendant.

CD4 advised that he/she obtained methamphetamine and pills from Defendant and on one occasion, observed Defendant counting out around 2,000-3,000 fentanyl pills at MACHEN's residence. CD4 also advised he/she was threatened by both Defendant and VELA-HERNANDEZ.

CD5 advised that he/she obtained drugs from Defendant, who is a high-volume trafficker. CD5 advised that Defendant and CANO travel to California to pick up their supply of methamphetamine and fentanyl pills. CD5 also advised that he/she also sold about 200 fentanyl pills per day for the Defendant, and had been doing that since about December 2021. CD5 also advised that if Defendant was not available, CD5 would get the pills (and give the proceeds from the sale of pills) to/from either CANO or FULCHER. CD5 also noted he/she would also get pills from CASTRO-VASQUEZ. CD5 clarified that the pills CD5 would sell came from Defendant, while pills that he/she would personally use came from

PLEA AGREEMENT - 12

CASTRO-VASQUEZ, although CD5 did not know where CASTRO-VASQUEZ obtained his pills. CD5 also stated that CANO and Defendant obtained "multiple boats" of fentanyl pills from ROJAS.

CD6 advised that Defendant has a source of supply of methamphetamine and pills in California, and this supplier cooks his own methamphetamine. CD6 also advised the supplier's group operates out of VERCUZCO-MENDOZA's residence when they are in town and have finished product to bring. CD6 also stated that BARAJAS' compound in Moses Lake was being utilized by Defendant's supplier to cook methamphetamine; however, that had been a recent falling out between Defendant and his supplier over misappropriated ephedrine. CD6 stated that Defendant was usually getting about 15,000 fentanyl pills at a time.

9. <u>The United States Agrees</u>:

    a. *Not to File Additional Charges*:

The United States Attorney's Office for the Eastern District of Washington agrees not to bring additional charges against Defendant based on information in its possession at the time of this Plea Agreement that arise from conduct that is either charged in the Indictment or identified in discovery produced in this case, unless Defendant breaches this Plea Agreement before sentencing.

    b. *Dismissal of Count 2*:

At the time of sentencing, the United States agrees to move to dismiss Count 2 of the Indictment which charges Defendant with Carjacking, in violation of 18 U.S.C. § 2119(1), provided Defendant does not breach the Plea Agreement.

10. <u>United States Sentencing Guideline Calculations</u>:

Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG" or "Guidelines") apply and that the Court will determine Defendant's advisory range at the time of sentencing, pursuant to the

PLEA AGREEMENT - 13

Guidelines. The United States and Defendant agree to the following Guidelines calculations:

    a.    *Base Offense Level and Relevant Conduct*:

The parties agree and stipulate that more than 90,000 kilograms of converted drug weight was possessed with the intent to distribute, distributed, and attempted to be distributed in furtherance of the criminal activity jointly undertaken by Defendant and his co-conspirators; this amount was within the scope of Defendant's agreement; this amount was reasonably foreseeable to this Defendant in connection with the conspiracy; and this Defendant's relevant conduct for sentencing purposes should be calculated based upon this amount, pursuant to USSG §1B1.3.

Therefore, the parties agree and stipulate that, his base offense level is 38. *See* USSG §2D1.1(a)(5), (c)(2); USSG §1B1.3(a).

    b.    *Specific Offense Characteristics*:

The United States and Defendant agree to recommend a 2-level enhancement is appropriate as Defendant possessed a firearm connected to the offense. *See* USSG §2D1.1(b)(1). The United States and Defendant agree to recommend a 2-level enhancement is appropriate as Defendant used violence related to this offense. *See* USSG §2D1.1(b)(2).

The United States and Defendant agree to recommend no additional specific offense characteristics apply. *See generally* USSG §2D1.1(b).

Defendant acknowledges he is not eligible for any relief under "safety valve" provisions as he possessed a firearm. *See* USSG §2D1.1(b)(18); USSG §5C1.2; 18 U.S.C. § 3553(f).

    c.    *Role Adjustments*:

The United States and Defendant agree to recommend Defendant receive a 2-level aggravating role enhancement as he was a leader / organizer. *See* USSG §3B1.1(c).

PLEA AGREEMENT - 14

d.  *Acceptance of Responsibility*:

The United States will recommend that Defendant receive a three-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a), (b), if Defendant does the following:

    i.  accepts this Plea Agreement;

    ii. enters a guilty plea at the first Court hearing that takes place after the United States offers this Plea Agreement;

    iii. demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct;

    iv. provides complete and accurate information during the sentencing process; and

    v.  does not commit any obstructive conduct.

The United States and Defendant agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged with, or convicted of, any criminal offense, or if Defendant tests positive for any controlled substance.

e.  *No Other Agreements*:

The United States and Defendant have no other agreements regarding the Guidelines or the application of any Guidelines enhancements, departures, or variances. Defendant understands and acknowledges that the United States is free to make any sentencing arguments it sees fit, including arguments arising from Defendant's uncharged conduct, conduct set forth in charges that will be dismissed pursuant to this Agreement, and Defendant's relevant conduct.

f.  *Criminal History*:

The United States and the Defendant have made no agreement and make no representations as to the Defendant's Criminal History Category, which shall be

PLEA AGREEMENT - 15

determined by the Court at sentencing after the Presentence Investigative Report is completed.

11. <u>Length of Incarceration</u>:

The United States agrees to recommend no more than 300 months. Defendant is free to recommend any legal sentence. Defendant acknowledges he cannot be sentenced to less than 120 months, the applicable mandatory minimum.

12. <u>Supervised Release</u>:

The United States and Defendant each agree to recommend 5 years of supervised release. Defendant agrees that the Court's decision regarding the conditions of Defendant's Supervised Release is final and non-appealable; that is, even if Defendant is unhappy with the conditions of Supervised Release ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or any term of Supervised Release.

The United States and Defendant agree to recommend that in addition to the standard conditions of supervised release imposed in all cases in this District, the Court should also impose the following conditions:

   a. that Defendant participate and complete such drug testing and drug treatment programs as the Probation Officer directs, but not to exceed six non-treatment drug tests per month during the imposed term of supervised release; and

   b. that Defendant's person, residence, office, vehicle, and belongings are subject to search at the direction of the Probation Officer.

13. <u>Criminal Fine</u>:

The United States and Defendant agree to recommend the Court impose no criminal fine. Defendant acknowledges that the Court's decision regarding a fine is final and non-appealable; that is, even if Defendant is unhappy with a fine ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea,

PLEA AGREEMENT - 16

withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or fine.

14. <u>Mandatory Special Penalty Assessment</u>:

Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, pursuant to 18 U.S.C. § 3013.

15. <u>Payments While Incarcerated</u>:

If Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, Defendant agrees to earn money toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

16. <u>Additional Violations of Law Can Void Plea Agreement</u>:

The United States and Defendant agree that the United States may, at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its sentencing recommendation if, prior to the imposition of sentence, Defendant is charged with or convicted of any criminal offense or tests positive for any controlled substance.

17. <u>Waiver of Appeal and Collateral Attack Rights</u>:

Defendant understands that Defendant has a limited right to appeal or challenge Defendant's conviction and the sentence imposed by the Court. Defendant expressly waives his right to appeal his conviction and/or sentence if the Court sentences Defendant to no more than a total of 300 months of incarceration. If the Court sentences Defendant to more than 300 months of incarceration, Defendant may only appeal the reasonableness of his sentence.

Defendant also expressly waives Defendant's right to appeal any fine, term of supervised release, or restitution order imposed by the Court.

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from

PLEA AGREEMENT - 17

information not now known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

18. <u>Withdrawal or Vacatur of Defendant's Plea</u>:

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

    a. this Plea Agreement shall become null and void;

    b. the United States may prosecute Defendant on all available charges;

    c. the United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

    d. the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and/or defenses Defendant might have to the United States' decisions to seek, reinstate, or reinitiate charges if a count of conviction is withdrawn, set aside, vacated, reversed, or dismissed, including any claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time, including but not limited to, alleged violations of any statutes of limitation or any

PLEA AGREEMENT - 18

objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

19. <u>Integration Clause</u>:

The United States and Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and Defendant, and no other promises, agreements, or conditions exist between the United States and Defendant concerning the resolution of the case.

This Plea Agreement is binding only on the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities.

The United States and Defendant agree that this Agreement cannot be modified except in a writing that is signed by the United States and Defendant.

<u>Approvals and Signatures</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Vanessa R. Waldref
United States Attorney

_____     _19 Sep 23_
Caitlin Baunsgard    *Chris Bridger*    Date
Assistant U.S. Attorney    *for Caitlin Baunsgard*

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in

PLEA AGREEMENT - 19

this Plea Agreement, and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

_____    9-19-23
EDWARD JAMES SALVADOR              Date
Defendant

I have read the Plea Agreement and have discussed the contents of the Plea Agreement with Defendant. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in Defendant's decision to plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept Defendant's plea of guilty.

_____    9-19-23
Dave Partovi                        Date
Attorney for the Defendant

PLEA AGREEMENT - 20